July 18, 2023

|                                                                                                        |   |                   |
| ------------------------------------------------------------------------------------------------------ | - | ----------------- |
| Jessica Marie Purcell                                                                                  | : |                   |
| v.                                                                                                     | : | No. 2023-26-M.P.  |
| Clay Johnson et al.                                                                                    | : |                   |
|                                                                                                        |   |                   |
| Clay Johnson, in his capacity as Council Appointee to the Chariho Regional School Committee, et al.   | : |                   |
| v.                                                                                                     | : | No. 2023-28-M.P.  |
| Chariho Regional School Committee.                                                                     | : |                   |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or Email opinionanalyst@courts.ri.gov of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Jessica Marie Purcell : 

v. : No. 2023-26-M.P.

Clay Johnson et al. :

Clay Johnson, in his capacity as : 
Council Appointee to the Chariho 
Regional School Committee, et al. 

v. : No. 2023-28-M.P.

Chariho Regional School :
Committee.

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.** These are petitions in equity in the nature of quo warranto, which came before the Supreme Court for oral argument on April 13, 2023. Jessica Marie Purcell (Purcell) brings an action in quo warranto, seeking a determination by the Supreme Court that Clay Johnson (Johnson) be removed from the Chariho Regional School Committee (the School Committee) and ordering the Town Council (the Council) of the Town of Richmond (the Town) to appoint Purcell to the School Committee. Similarly, Johnson brings an action in quo warranto, seeking a determination that he rightfully retain his membership on the

- 1 -

School Committee following his appointment to same by the Council.[2] For the reasons set forth herein, we grant Purcell's petition and deny Johnson's petition.

**Facts and Travel**

The facts giving rise to the instant dispute are taken from the parties' agreed-upon statement of facts, as well as from their submissions to this Court. The Chariho Regional School District (the School District) includes the towns of Charlestown, Richmond, and Hopkinton, and its operating authority is the School Committee. The jurisdiction of the School Committee is governed by the Chariho Act. *See* P.L. 1958, ch. 55, as amended by P.L. 1986, ch. 286. The Chariho Act was adopted to authorize the towns of Charlestown, Richmond and Hopkinton, to incorporate and join a regional School District, providing for the issuance of bonds, construction and operation of a regional school system for the joint use of the participating towns. *Id*. At present, each member town elects four individuals to the twelve-member School

---

[2] The Town and Johnson indicated in their brief that their quo warranto petition was filed

> "prior to the School Committee meeting at which Johnson was to be seated – after counsel for the Chariho School Committee represented that he would advise his client not to recognize the new appointee as a member. On the night of the meeting, however, counsel relented, and advised that Johnson should be seated while Purcell's quo warranto petition was resolved, thus obviating the need for the Town/Johnson petition."

However, our record indicates that Johnson's petition has not been withdrawn and remains before the Court.

Committee.  The School Committee members are elected to four-year terms on a "staggered two-year election cycle," meaning that each town elects two members of the School Committee every two years.  In the event of a vacancy on the School Committee, § 10(1)(c) of the Chariho Act provides, in pertinent part, that:

> "the town council of the member town in which such vacancy occurs shall fill such vacancy by election by a majority vote of the town council of said town for the unexpired term of the member whose office is thus vacated."

The Town adopted a Home Rule Charter (the Charter) in 2008, which was later ratified by the General Assembly in 2009. *See* P.L. 2009, ch. 12.  Article 2, § 5(B) of the Charter, entitled "Vacancy in elective office[,]" provides, in part, if "a school committee seat becomes vacant, the Town Council shall appoint the unelected candidate who received the greatest number of votes for that office in the most recent general or special election."

On November 8, 2022, members of the Town elected two residents to their town's vacant seats on the School Committee; those positions were filled by Patricia Pouliot, who received 1,549 votes, and Kathryn Colasante, who received 1,496 votes.  The certified results indicated that Purcell received the third-highest number of votes (1,469 votes), making her the unelected candidate with the highest number of votes.  On or about January 5, 2023, Gary Ligouri (Ligouri) submitted his

resignation from the School Committee to the Town Council.[3]  On January 19, 2023, the Town Council voted to appoint Johnson to the resulting vacancy to serve the remainder of Ligouri's term.  Johnson was thereafter sworn in and seated on the School Committee.

On January 23, 2023, Purcell filed a petition in equity and memorandum of law for writ of quo warranto against Johnson, the Council, and the School Committee, seeking an order that removes Johnson from the School Committee and requires the Council to appoint Purcell thereto, as prescribed by the Charter.[4]  The next day, on January 24, 2023, Johnson and the Town filed an emergency quo warranto petition, claiming right and title to the public office pursuant to the Act.[5]

**Jurisdiction**

This Court has recognized that "'an action to test one's title to office is an action in quo warranto,' whereby one may bring a petition in equity in the nature of quo warranto, asserting his or her right to the office at issue." *Felkner v. Chariho Regional School Committee*, 968 A.2d 865, 869 (R.I. 2009) (quoting *McKenna v. Williams*, 874 A.2d 217, 228, 229 (R.I. 2005)). An action in quo warranto, "or an

---

[3] Ligouri was elected to the School Committee from the Town in 2020, and his term would have expired in 2024.

[4] Purcell and Johnson are both residents of the Town.

[5] Of note, the School Committee did not submit a brief in this matter.  Furthermore, neither the School District, nor the Towns of Charlestown and Hopkinton sought to intervene.  These actions were consolidated by an order entered on January 31, 2023.

information in the nature of quo warranto, is a common law remedy or proceeding whereby the state directs an individual to show by what warrant he holds public office and to oust him from its enjoyment if the claim is not well found." *Fargnoli v. Cianci*, 121 R.I. 153, 161, 397 A.2d 68, 72 (1979). A petitioner who prevails "obtains a decree which not only ousts the respondent from office but also declares that the petitioner is the rightful holder of the office in dispute." *Fargnoli*, 121 R.I. at 162, 397 A.2d at 73. The petitioning party "bears the burden of establishing by a fair preponderance of the evidence that the respondent is not entitled to the office and should be ousted and that the petitioner is the rightful holder of the office." *Seemann v. Kinch*, 606 A.2d 1308, 1310 (R.I. 1992).

Jurisdiction over such claims is vested exclusively in the Supreme Court when brought by a private citizen. *See* G.L. 1956 § 10-14-1 ("The title to any office, to determine which the writ of quo warranto lies at the common law, may be brought in question by petition to the [S]upreme [C]ourt."); *see also McKenna*, 874 A.2d at 229 ("A private citizen who questions the right of an incumbent to hold office may employ only a petition in equity in the nature of quo warranto, and jurisdiction over such petitions is exclusively vested in the Supreme Court.").[6]

---

[6] Pursuant to G.L. 1956 § 10-14-2:

> "In any proceeding upon writ of quo warranto, or by information or by petition in the nature of quo warranto, the [C]ourt may determine the title of the relator or

- 5 -

**Discussion**

The ultimate question presented by the instant petitions is whether the Council followed the proper procedure in appointing Johnson to fill the vacancy on the School Committee subsequent to Ligouri's resignation. More specifically, whether the Council properly elected Johnson pursuant to § 10(1)(c) of the Chariho Act, or whether the Council violated Article 2, § 5(B) of the Charter by not appointing Purcell, the unelected candidate who received the greatest number of votes for that office in the most recent general or special election.

We must start by addressing the threshold question of whether the Charter has been ratified. This Court has stated that "no provision affecting education contained within a home rule charter, so called, can effectively regulate the conduct of school committees as agents of the state unless expressly validated by an act of the general assembly." *Royal v. Barry*, 91 R.I. 24, 30, 160 A.2d 572, 575 (1960). However, "if [the General Assembly] chooses to do so it may by appropriate legislation validate

---

petitioner as well as that of the respondent; and in any such proceeding, all or any persons claiming the same office by whatever title, or claiming different offices depending upon the same election or appointment, may be made parties, and their respective rights may be ascertained and determined; and the court may consolidate for the purposes of healing and adjudication all such proceedings if brought separately."

any provision in a home rule charter which is inconsistent with this [requirement]." *Opinion to the House of Representatives*, 80 R.I. 288, 296, 96 A.2d 627, 631 (1953).

Purcell maintains that the General Assembly expressly ratified the entire Charter in section 1 of P.L. 2009, ch. 12 and, further, that the Chariho Act and the Charter can be read congruently. She emphasizes that this Court has said that to be considered expressly ratified, the ratification of a charter as a whole is sufficient. Purcell argues that, if the Chariho Act and the Charter are in conflict, the canons of statutory construction mandate that the Charter prevails because it is more specific than the Chariho Act and that it became effective and is more recent in time than the Chariho Act.

Johnson's most emphatic argument is that the vacancy provision of the Charter was not expressly ratified by the General Assembly because the Chariho Act was not referenced in either section 1 or 2 of the public law ratifying the Charter and, therefore, it did not attain the status of a state law. Specifically, Johnson asserts that the voters of the Town approved a Charter that would supersede any inconsistent legislation enacted by the General Assembly specifically for the benefit of the Town, and, thus, the Chariho Act does not qualify because it governs three municipalities. Moreover, Johnson points to the Rhode Island Constitution, which gives authority to the General Assembly over all aspects of public education as a matter of statewide, not local concern. Johnson maintains that "the General Assembly passed a specific,

limited ratification" of the Charter that did not repeal the Chariho Act's vacancy-filling provision because the Chariho Act applies to three municipalities and is not a statute of general statewide application, nor does it apply to just the Town. Therefore, according to Johnson, the Chariho Act controls. If the Court deems the Charter ratified, then Johnson argues that the statutes cannot be harmonized because they are incompatible and, therefore, the Chariho Act should control.

The initial question before us is what constitutes "express validation." The Town voted on and adopted the Charter in 2008. The General Assembly ratified the Charter in 2009. In pertinent part, P.L. 2009, ch. 12, states:

> "SECTION 1. In all respects in which the Home Rule Charter adopted by the electors of the Town of Richmond on November 4, 2008 may require ratification, confirmation, validation or enactment by the General Assembly, but in no other respects, the provisions of the Home Rule charter of the Town of Richmond are hereby ratified, confirmed, validated and enacted. *It is the express intent of the General Assembly by the passage of this Act to give effect and to ratify, confirm, validate and enact those provisions of the said Home Rule Charter of the Town of Richmond that require ratification, confirmation, validation or enactment, and by the passage of this Act, the General Assembly does hereby ratify, confirm, validate and enact said Home Rule Charter*, but nothing in this Act shall be construed to abrogate or impair the powers now or hereafter granted to the towns by Article XIII of the Constitution of the State of Rhode Island or those rights retained by said Town of Richmond.

> "SECTION 2. All special acts or portions of special acts of the General Assembly enacted solely for the benefit of the Town of Richmond that are inconsistent with the

provisions of the Home Rule Charter adopted by the electors of the Town of Richmond on November 4, 2008 are hereby repealed, including but not limited to Chapter 1674 of the Public Laws of 1930 (election of town officers), Chapter 3705 of the Public Laws of 1956 (election of town officers), Chapter 264 of the Public Laws of 1968 (tax assessor and board of review), Chapter 106 of the Public Laws of 1969 (tax assessor and board of review), Chapter 362 of the Public Laws of 1978 (fees collected by public officials), Chapter 35 of the Public Laws of 1988 (tax bills), Chapter 79 of the Public Laws of 2002 (Planning Board alternates), Chapter 124 of the Public Laws of 1986 (street acceptance), Chapter 39 of the Public Laws of 1967 (budget committee), Chapter 17 of the Public Laws of 1990 (budget committee), Chapter 52 of the Public Laws of 1990 (financial town meeting), Chapter 17 of the Public Laws of 1993 (financial town meeting); and Chapter 51 of the Public Laws of 1990 (board of finance)." (Emphasis added.)

Ratification of a charter as a whole by the General Assembly has been sufficient to expressly ratify a provision of the charter. *See Foster Glocester Regional School Building Committee v. Sette*, 996 A.2d 1120, 1125-26 (R.I. 2010) (holding that an inconsistent special act creating a regional school district and a ratified Home Rule Charter must be analyzed using statutory construction); *see also* P.L. 1991, ch. 55. Here, the General Assembly expressly ratified the entire Charter. Section 1 of P.L. 2009, ch. 12 provides that "[*i*]*n all respects* in which the Home Rule Charter * * * may *require ratification, confirmation, validation or enactment* by the General Assembly, but in no other respects, the provisions of the Home Rule charter of the Town of Richmond are hereby ratified, confirmed, validated and

enacted." *See* P.L. 2009, ch. 12, § 1 (emphasis added). As was the case in *Sette*, the public law ratifies the Charter with broad language, thereby enacting all provisions that required it. *See* P.L. 1991, ch. 55; P.L. 2009, ch. 12.[7] We "presume[] that the General Assembly knows the state of existing relevant law when it enacts or amends a statute." *Power Test Realty Company Limited Partnership v. Coit*, 134 A.3d 1213, 1222 (R.I. 2016) (quoting *Retirement Board of Employees' Retirement System of Rhode Island v. DiPrete*, 845 A.2d 270, 287 (R.I. 2004)). To require the General Assembly to enumerate each provision of a municipal charter, after stating its express intent to ratify, confirm, validate or enact all of the provisions therein that require it, would be an absurd result. *Mendes v. Factor*, 41 A.3d 994, 1002 (R.I. 2012) ("[U]nder no circumstances will this Court construe a statute to reach an absurd result.") (internal quotations marks omitted).

---

[7] As is true in the present case, P.L. 1958, ch. 109, the act creating the Foster-Glocester Regional School District, provided a comprehensive statutory structure that laid out procedures and authorizations for the operation of a regional school district. *See Foster Glocester Regional School Building Committee v. Sette*, 996 A.2d 1120, 1122-23 (R.I. 2010). In pertinent part, P.L. 1958, ch. 109, § 1 states:

> "There is hereby established a regional school district comprising the towns of Foster and Glocester in accordance with the terms of the agreement filed with the town councils of the towns of Foster and Glocester by the regional school district planning board established under the provisions of general laws, 1956, 16-3 and accepted by the town of Foster at a financial town meeting held on March 3, 1958 and by the town of Glocester at a financial town meeting held on March 8, 1958."

It is clear that the language used by the General Assembly in section 1 of P.L. 2009, ch. 12 enacts all provisions of the Charter, including Article 2, § 5(B). Section 2 repeals all special acts or portions of special acts enacted by the General Assembly "*solely for the benefit* of the Town of Richmond that are inconsistent with the provisions of the Home Rule Charter," and it specifically enumerated those acts. *See* P.L. 2009, ch. 12, § 2 (emphasis added). No portion of the Chariho Act was listed among the statutes to be repealed.[8] *See id.* Under the Home Rule Amendment that is set forth in article 13 of the Rhode Island Constitution, a municipality may adopt charter provisions that affect education, as long as such charter provisions are ratified by an explicit legislative act. *See Town of Johnston v. Santilli*, 892 A.2d 123, 128 (R.I. 2006).

Next, we must determine if the Chariho Act and the Charter can be harmonized. It is "an especially well-settled principle of statutory construction" that when two laws are *in pari materia*, the Court will harmonize them whenever possible. *Horn v. Southern Union Co.*, 927 A.2d 292, 295 (R.I. 2007); *see also Kells v. Town of Lincoln*, 874 A.2d 204, 212 (R.I. 2005). Even if the laws appear at first to be inconsistent, the Court will make every effort to construe the provisions "in such a manner so as to avoid the inconsistency." *Kells*, 874 A.2d at 212 (quoting

---

[8] At oral argument, both sides conceded that the Chariho Act was not amended or repealed either in whole or in part.

*Montaquila v. St. Cyr*, 433 A.2d 206, 214 (R.I. 1981)). "This rule of construction applies even though the statutes in question [may] contain no reference to each other and are passed at different times." *State v. Ahmadjian*, 438 A.2d 1070, 1081 (R.I. 1981).

Purcell's contention is that there is no impediment to the Council's conduct being in harmony with both the Charter and the Chariho Act. She reasons that to follow the procedures for filling a vacancy set forth in the Charter, the Council does not necessarily need to breach the procedure mandated by the Chariho Act. Conversely, Johnson maintains that the ministerial procedure of appointing the next highest vote-getter set out in the Charter cannot be harmonized with the discretionary procedure, giving the Council the authority to choose the next School Committee member, in the Chariho Act. Johnson suggests that the possibility of the Council appointing Purcell without violating the Chariho Act is not the proper standard, and that the question is whether the Charter's mandated appointment is inconsistent with the Chariho Act's discretionary appointment.

The Chariho Act is silent as to whom the Council may appoint. That silence places no limitation on whom the Council may elect. *Orthopedic Specialists, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 120 R.I. 378, 387, 388 A.2d 352, 357 (1978) ("[W]here the Legislature is silent, we cannot break their silence and fill any perceived statutory voids by judicial interpretation or implication."). Therefore, the

Chariho Act leaves the discretion of who is elected to the Council. Conversely, the Charter is specific in requiring that the Council "shall appoint the unelected candidate who received the greatest number of votes for that office in the most recent general or special election." Richmond Town Charter, Art. 2, § 5(B). It is clear that there is no discretion within the Charter's procedures as to filling a vacancy on the School Committee. The direction of the Council's conduct in the Charter is clearly inconsistent with the discretion provided to the Council in the Chariho Act. In attempting to harmonize the inconsistent provisions, the discretion of the Chariho Act is effectively nullified. Section 10(1)(c) of the Chariho Act and Article 2, § 5(B) of the Charter cannot be harmonized.

We must now turn to the applicable canons of statutory construction to identify which of the conflicting laws controls. "When this Court engages in statutory construction, 'our ultimate goal is to give effect to the purpose of the act as intended by the Legislature.'" *Powers v. Warwick Public Schools*, 204 A.3d 1078, 1085 (R.I. 2019) (quoting *State v. Whiting*, 115 A.3d 956, 958 (R.I. 2015)). This Court follows the rule of statutory construction that, when faced with "competing statutory provisions that cannot be harmonized, we adhere to the principle that 'the specific governs the general * * *.'" *Felkner*, 968 A.2d at 870 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). "When a specific statute conflicts with a general statute, our law dictates that precedence must be given to the

specific statute." *South County Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 215 (R.I. 2015) (quoting *Warwick Housing Authority v. McLeod*, 913 A.2d 1033, 1036-37 (R.I. 2007)). "[I]t is a 'general rule of statutory construction that when a statute of general application conflicts with a statute that specifically deals with a special subject matter, and when the two statutes cannot be construed harmoniously together, the special statute prevails over the statute of general application.'" *City of Woonsocket v. RISE Prep Mayoral Academy*, 251 A.3d 495, 501 (R.I. 2021) (deletion omitted) (quoting *Whitehouse v. Moran*, 808 A.2d 626, 629-30 (R.I. 2002)). If a statute cannot be construed as more specific, we will adopt the statute more recent in time. *Berthiaume v. School Committee of City of Woonsocket*, 121 R.I. 243, 248-49, 397 A.2d 889, 893 (1979) ("Only when the two statutory provisions are irreconcilably repugnant will a repeal be implied and the last-enacted statute be preferred.").

Originally enacted in 1958, the Chariho Act set forth a statutory structure that created the Chariho Regional School District and took governing jurisdiction over the School District. *See* P.L. 1958, ch. 55. The statutory structure laid out procedures and authorizations for special elections, corporate powers, bond authorizations, committee meetings, curricula, building committees, and budgets, among other things. *See id*. This expansive statutory structure did not, however, account for a vacancy on the School Committee in any provision. In 1986 the General Assembly

- 14 -

authorized amendments and additions to the 1958 form of the Chariho Act. *See* P.L. 1986, ch. 286. The amendments and additions included amendments concerning special elections, bonds, budgets, meeting procedures, and the addition of a School Committee vacancy-filling provision. *See id*.

The Charter was originally adopted in 2008 and was later ratified by the General Assembly in 2009. *See* P.L. 2009, ch. 12. It provides that it was enacted "to secure for [the citizens] and for future generations the right to local self-government guaranteed to us by Article XIII of the Constitution of the State of Rhode Island[.]" Richmond Town Charter, Preamble. Thereafter, amendments to the Charter were adopted in 2010, 2012, 2014, 2015 and 2022.[9] The relevant language from Article 2, § 5(B) of the Charter, entitled "Vacancy in elective office[,]" has never been amended from its original 2008 form.

The primary question of statutory construction before us is which statute is more specific, the Charter or the Chariho Act. We have been clear that when "the specific terms are controlling, this Court will defer to the more precise language governing a particular subject." *Felkner*, 968 A.2d at 870. As was discussed above, *Sette* made clear that a charter ratified by the General Assembly prevails over a

---

[9] The Charter's 2022 amendments have just recently been ratified by the General Assembly and became effective without the Governor's signature at the time of this writing with legislation that mirrors the ratification language of P.L. 2009, ch. 12, with the exception that there is no explicit repeal of inconsistent laws in the recent legislation.

statewide law and that an act limited to regional school issues cannot be fairly characterized as a general state law. *Sette*, 996 A.2d at 1125-26. However, in the event of conflict, we will construe "the provisions of a municipal charter in accordance with the customary rules of statutory construction." *Id*. at 1126. In *Sette*, this Court said that a home rule charter that has been ratified "by an explicit legislative act" carries the same weight as a special act. *Id*. at 1125. More specifically, like in the instant case, the ratified legislation's purpose was to establish and manage a regional school district. *See id.* at 1122-23. We were clear in *Sette* that a charter ratified by the General Assembly prevails over an inconsistent provision of a law of statewide application. *Id*. at 1125-26. This Court concluded that Glocester's charter had been explicitly ratified; therefore, in the event of a conflict, the question becomes one of specific versus general. *Id*. at 1126.

The Chariho Act provides a simple mechanism where the Council by a majority vote shall fill a vacancy on the School Committee. There is no guidance as to who the new appointee will be, with complete discretion given to the Town Council. These general terms of the Chariho Act are applicable across three towns with just one procedure in place.[10] *See* P.L. 1958, ch. 55, as amended by P.L. 1986, ch. 286, § 10(1)(a). At oral argument, counsel acknowledged that it sets out a

---

[10] Again, we note that the School Committee, the School District, and the Towns of Charlestown and Hopkinton opted to not seek to be heard in these matters.

- 16 -

completely discretionary procedure. By comparison, the Charter precisely sets forth a process by which the Council shall appoint "the unelected candidate who received the greatest number of votes for that office in the most recent general or special election." Richmond Town Charter, Art. 2, § 5(B). Furthermore, the Charter outlines an entire procedure to fill the vacancy in the event that appointee is not available by selecting, "in sequence the unelected candidates who received the next greatest number of votes." *Id*. If no appointee in that sequence is available, the Charter gives authority to the Council to "appoint a qualified elector to serve the remainder of the term." *Id*. The Charter is specific in its outline of a substantive procedure to fill the vacancy and precise in who the appointee will be. The Charter is clearly more specific. For these reasons, the Charter controls.

Our ultimate goal is to give effect to the purpose of the statutes as intended by the General Assembly, and we presume that the Legislature knew that the Chariho Act included a general vacancy provision for the School Committee when it approved the Charter that included a more specific vacancy-filling provision for the School Committee. *See Power Test Realty Company Limited Partnership*, 134 A.3d at 1222. It is clear that it was the will of the voters in the Town to have procedures in place to fill a vacancy on the School Committee with an individual who had shown some effort and desire to be on the School Committee by running for the seat. Article 2, § 5(B) of the Charter fills the vacancy with the next-highest vote-getter in the most

recent general or special election. While the Chariho Act affects three towns, all of the towns have an equal number of seats on the School Committee. The procedures by which an empty seat is filled by one community has no bearing on the other communities.

## Conclusion

For the foregoing reasons, Johnson's petition is denied and dismissed. Accordingly, Purcell's petition is granted, and she is legally entitled to the office of Chariho Regional School Committee member. A judgment of ouster from the office of school committee member in the Chariho Regional School District shall be entered against Johnson.

**Justice Goldberg, dissenting**. Because I am convinced that the decree and judgment of ouster issued by the majority has been wrongfully decided, I dissent.[1] Under this Court's long-standing and well-established jurisprudence unless, when it ratified the Richmond Home Rule Charter (Richmond Town Charter or Charter), the General Assembly expressly ratified and validated a specific provision—Article 2, § 5(B) of the Richmond Town Charter—the provision addressing the filling of vacant seats on the Chariho Regional School Committee, an elected body, vested

---

[1] I confine my analysis in this dissenting opinion to the petition of Jessica Marie Purcell.

with "all the powers and duties conferred by law in this state upon school committees of towns," P.L. 1958, ch. 55, § 10(3) as amended (the Chariho Act), the Charter provision is void as to the Chariho Regional School Committee.

The responsibility of resolving conflicts that arise where the state and a municipality have each legislated on the same subject matter is left to the courts. *Marro v. General Treasurer of City of Cranston*, 108 R.I. 192, 196, 273 A.2d 660, 662 (1971). After carefully examining the relevant statutory provisions upon which petitioner Purcell relies, including the various iterations of the Chariho Act that span sixty-five years and this Court's numerous and clear pronouncements when confronted with a provision in a home rule charter that concerns the constitutional authority over education and elections reserved to the General Assembly, I am of the opinion that Article 2, § 5(B) of the Richmond Town Charter does not supersede the Chariho Act under article 13 of the Rhode Island Constitution.

This Court has declared that "the regulation of elections, *Opinion to the House of Representatives*, 80 R.I. 288, 96 A.2d 627 [(1953)]; education, *Royal v. Barry*, 91 R.I. 24, 160 A.2d 572 [(1960)]; licensing, *State v. Krzak*, [97 R.I. 156, 196 A.2d 417 (1964)]; *Newport Amusement Co. v. Maher*, [92 R.I. 51, 166 A.2d 216 (1960)]; and the conduct of business, *Nugent ex rel. Hurd v. City of East Providence*, 103 R.I. 518, 238 A.2d 758 [(1968)], were matters with respect to which the state had not

surrendered its sovereignty to a home rule municipality." *Marro*, 108 R.I. at 196 n.5, 273 A.2d at 662 n.5.

I am of the opinion that Article 2, § 5(B) of the Richmond Town Charter strips the town council of its discretion, by election of a majority vote of the town council, to fill a vacancy on the Chariho Regional School Committee, a separate body politic statutorily created by the General Assembly. Because Article 2, § 5(B) mandates the appointment of an unelected candidate from the last election, it is in conflict with the General Assembly's exclusive jurisdiction over elections and education and it does not supersede the Chariho Act.

In accordance with this Court's long-standing and well-established jurisprudence, this Court should conclude, in the exercise of our original jurisdiction, that the Charter provision was not expressly ratified by the General Assembly, as that requirement has been defined by this Court. The majority's reliance on the general ratification provision for the Richmond Town Charter, found in P.L. 2009, ch. 12 is erroneous, in my opinion. It is my belief that express ratification is a manifestation of assent by the General Assembly that a specific provision of a charter that affects the plenary powers of the General Assembly over school committees and education has been delegated to a city or town, after the enactment of a home rule charter.

I also disagree with the majority's conclusion that Article 2, § 5(B) of the Richmond Town Charter meets this Court's long-standing canons of statutory construction that is the more specific provision before us. As will be discussed herein, when an act of the General Assembly conflicts with a charter provision that has been expressly validated by the General Assembly, as the majority concludes, the charter provision takes precedence over the statute and the analysis is at an end. Statutory construction is unnecessary.

I also disagree with the conclusions reached by the majority that the provision in the Richmond Town Charter is the more specific enactment before us. The majority failed to examine the Chariho Act in its entirety and the sixty-five-year history of the General Assembly's authority over this regional school district. The majority, erroneously I conclude, confined its analysis to a single subsection of Section 10 of the Chariho Act.

The vacancy provision of the Chariho Act that is the subject of this petition was first enacted and approved by the voters of three towns in 1986; Section 10 was amended twice after 1986, in 2006 and in 2016, and each amendment restated the vacancy provision. Section 10 of the Chariho Act addresses, in every aspect, the creation, election, duties, and authority vested in a regional school district. It spans several pages of text and sets forth in comprehensive detail the number of seats on the School Committee, the number of members, who must be *elected* (not appointed)

in direct proportion to its population in the district, and be qualified electors of the town, and, significantly, it sets forth how a vacancy must be filled by each of the three member towns. Although it is my opinion that statutory construction is unnecessary in this case, it is safe to conclude that Article 2, § 5(B) is not the more specific of the two.

## Quo Warranto

When this Court presides over a petition in equity in the nature of quo warranto, in accordance with G.L. 1956 § 10-14-1, we exercise our original jurisdiction, in which the petitioner asserts his or her right to the office at issue. *McKenna v. Williams*, 874 A.2d 217, 229 (R.I. 2005). "A successful petitioner obtains a decree which not only ousts the respondent from office but also declares that the petitioner is the rightful holder of the office[] in dispute." *Fargnoli v. Cianci*, 121 R.I. 153, 162, 397 A.2d 68, 73 (1979). Accordingly, the Court proceeds by carefully examining the claim or claims before us, with cautious attention to the warrant upon which the petitioner seeks to establish his or her own title to the office and to oust a purported holder of that office. *See Whitehouse v. Moran*, 808 A.2d 626, 628-29 (R.I. 2002) (citing *Fargnoli*, 121 A.2d at 162, 397 A.2d at 73). I begin with the Chariho Regional School Committee, the body to which the petition relates and the Act of the General Assembly giving rise to the Chariho Regional School District.

## The Chariho Act

Sixty-five years ago, the General Assembly enacted enabling legislation authorizing "the Towns of Charlestown and Richmond together, or together with the Town of Hopkinton, to join a Regional High School District," P.L. 1958, ch. 55, upon vote of the qualified electors of the three towns, at a special election, *id.* § 1, after which the towns "jointly together [were] hereby incorporated into *a regional high school district as a body corporate and politic * * *.*" *Id.* § 2 (emphasis added).

After voter approval by each municipality, the regional high school district committee became operational. The 1958 enabling act set forth the authority of the regional high school district to issue bonds and construct a regional high school, after approval by a majority of the qualified voters at a meeting of the regional high school district.[2] *See* P.L. 1958, ch. 55, § 1. Section 10 of the enabling act provided for a regional high school committee "consisting of three (3) members from each member town, each of whom shall be a duly elected or appointed member of the school committee of the respective towns." *Id.* § 10. Thus, these members were drawn from the existing school committees of each town, which, of course, continued to operate their respective school systems, except the high school. Section 10 also specifically detailed the selection of future members in the event "the school committee of any

---

[2] A quorum for regional high-school district meetings was seventy-five qualified voters. *See* P.L. 1958, ch. 55, § 9(5).

- 23 -

member town is or shall be increased in size from the now existing three (3) members[,] the *school committee* of such town shall choose from among its own membership the three (3) members to serve on the regional high school committee." *Id*. (emphasis added).

Twenty-eight years later, in 1986, the General Assembly again turned its attention to education in the towns of Charlestown, Hopkinton, and Richmond and amended the 1958 enabling act significantly, including the name. Public Laws 1986, ch. 286, entitled "An Act in Amendment of and in Addition to Chapter 55 of the Public Laws, 1958 * * *," was enacted, approved by the voters and created a regional school district. The 1986 Act amended every section of the 1958 enabling act— including the name. It has become known as the Chariho Act and the body politic that was formed after the requisite voter approval is the Chariho Regional School Committee.

The 1986 Act granted authority for the regional school district "[t]o adopt a name and to adopt and use a corporate seal" and "acquire, take over, operate and control all regional schools including lands, buildings, equipment, furnishings * * * for the joint and common use of the member towns * * * for the education of pupils attending grades kindergarten through 12 inclusive * * *." Public Laws 1986, ch. 286, § 2(1), (3).

Section 10 of the 1986 Act provided for the creation of a regional school committee consisting of eleven members, with each town represented "in direct proportion to its population as determined by the most recent population census figures." Public Laws 1986, ch. 286, § 10(1)(a). Section 10(1)(a) was comprehensive. It set forth with precision the manner in which the members are to be elected, the number and length of terms for the initial years and thereafter, and the filling of vacancies. Section 10 of P.L. 1986, ch. 286 provides in relevant part as follows:

> "(1)(a) There shall be a regional school committee for said district consisting of eleven (11) members, each member town shall be represented on the committee in direct proportion to its population as determined by the most recent population census figures. The total population of the district shall then be divided by eleven (11) and the resulting quotients thus obtained shall be used as the basis for determining the proportionate representation of each said member town on said committee, and realizing that the mathematical divisions of said formula will not obtain absolute evenness, fractions of .5 or more shall be construed as 1 point and fractions less than .5 shall be construed as 0. Subject to limitations aforesaid, the members of said committee from each of the member towns to be elected or appointed for terms hereinafter set forth shall be determined as of the time of each bi-annual election and each of the said member towns, based upon the census aforesaid. The first such regional school committee shall be elected in the general election in November, 1988. In the general election 1988 each town electing three (3) members of the school committee shall elect two (2) members to serve a term of four (4) years and one (1) member to serve a term of two (2) years. A town electing more than three (3) representatives shall elect

three (3) members for a term of two (2) years and additional members for a term of four (4) years. Thereafter members shall be elected for a term of four (4) years. Until such time as those elected in that election shall be certified and qualified, the existing Chariho Regional High School District Committee shall serve as the Regional School Committee. *In the event of any vacancy by death, resignation or incapacity to serve of any term of any member of said regional school district committee, the town council of the member town in which such vacancy occurs shall fill such vacancy by election by a majority vote of the town council of said town for the unexpired term of the member whose office is thus vacated.*" (Emphasis added.)

While it is clear that in enacting P.L. 1986, ch. 286, the General Assembly exercised its plenary authority over both education and the election and terms of school committees, my focus in this dissent is the authority of the General Assembly over education. The highlighted final sentence in Section 10(1)(a) in the 1986 enabling act, although restated by the General Assembly over the years, has remained unchanged, the last iteration in 2016 a mere seven years ago. The 2016 amendment, P.L. 2016, ch. 86, provides in relevant part as follows:

"SECTION 1. Section 10(1) of Chapter 286 of 1986 Public Laws, * * * is hereby amended to read as follows:

"SECTION 10. (l)(a) There shall be a regional school committee for said district. * * * Each member town shall be represented on the committee in direct proportion to its population. * * * On the effective date of this amendment, one seat shall be added to the school committee, for a total of twelve (12) seats. The Richmond Town Council shall appoint a qualified elector to the twelfth seat for a term that expires in November 2018. In the general election of

- 26 -

2018, Richmond voters shall elect a school committee member to the twelfth seat to serve a four-year (4) term that expires in November 2022.

"* * *

"(1)(c) *In the event of any vacancy by death, resignation, or incapacity to serve of any term of any member of said regional school district committee, the town council of the member town in which such vacancy occurs shall fill such vacancy by election by a majority vote of the town council of said town for the unexpired term of the member whose office is thus vacated.*"[3] (Emphasis added.)[4]

My examination of the amendments to the Chariho Act over the years convinces me that the General Assembly has thoughtfully fulfilled its constitutional obligations for education over this, one of the first regional school districts in the state, and has shepherded its development for more than six decades. The Chariho Regional School Committee is an independent corporate body and the operational authority for the Chariho Regional School District. It is currently composed of twelve members, an increase from the eleven-member threshold in the 1986 Act, based on a population increase in the town of Richmond. *See Felkner v. Chariho Regional School Committee*, 968 A.2d 865, 869 (R.I. 2009) ("The Chariho Regional

---

[3] Thus were I to conclude that statutory construction was necessary to my analysis in this case, the 2016 amendment to the Chariho Act is the most recent pronouncement by the General Assembly.

[4] Public Laws 2016, ch. 91 is the identical House version of the 2016 amendment to the Chariho Act.

School Committee is composed of eleven members, with representation from each of the three towns in proportion to their respective populations.").

In the 2016 amendment, the General Assembly increased the membership to twelve members and, importantly, mandated that the new seat would be temporarily filled by the Richmond Town Council, which "*shall appoint a qualified elector to the twelfth seat* for a term that expires in November 2018[,]" until the 2018 general election, when "*Richmond voters shall elect a school committee member to the twelfth seat* to serve a four-year (4) term that expires in November 2022." Public Laws 2016, ch. 86, § 10(1)(a) (emphasis added). Thus, in 2016, the General Assembly enacted a vacancy-filling provision in tandem with Section 10 of the Chariho Act—by majority vote of the town council—and preserved the discretion vested in the Richmond Town Council by the Chariho Act.

Additionally, the 2016 amendment sets forth another complex formula, to calculate the minimum (10), and the maximum (14), number of seats, based on the population schedules of the most recent federal decennial census, beginning with the 2022 general election and every ten years thereafter, in order to "provide the most equal representation in proportion to population for all three (3) towns in the district." Public Laws 2016, ch. 86, § 10(1)(b). As noted, the 2016 amendment *restates and preserves unchanged* the vacancy provision of the 1986 enabling act

and provides for the new, temporary seat to be filled in accordance with that section. *Id*. § 10(1)(c); *see* P.L. 1986, ch. 286, § 10(1)(a).

Accordingly, the General Assembly has enacted legislation concerning the composition of the Chariho Regional School Committee several times[5] and on each and every occasion has provided that in the event of a vacancy, "the town council of the member town in which such vacancy occurs *shall fill such vacancy by election by a majority vote of the town council* of said town for the unexpired term of the member whose office is thus vacated." *See* P.L. 2016, ch. 86, § 10(1)(c) (emphasis added); P.L. 2006, ch. 419, § 10(1)(a) (emphasis added). This orderly, comprehensive, and consistent statutory scheme convinces me that the General Assembly has been actively engaged in exercising its plenary authority over all aspects of education in this bucolic southwestern corner of our state, such that the Chariho Regional School District is an established and well recognized "body corporate and politic," vested with "all the powers and duties conferred by law in this state upon school committees of towns." Public Laws 1958, ch. 55, §§ 2, 10(3). Having carefully reviewed the 1958 enabling act and the subsequent amendments, it is apparent throughout that the General Assembly has also seen fit to ensure that each member town was treated equally and with the utmost fairness.

---

[5] In 2006, the General Assembly amended a portion of Section 10 of the Chariho Act, but did not amend the vacancy provision. *See* P.L. 2006, ch. 419, § 10(1)(a).

Significantly, the General Assembly has distinguished circumstances in which a town council of a member town may fill a vacancy by appointment, which appointments are rare and temporary, from occasions when a member must be elected by a majority of the members of the town council of a particular town is mandated. Elections to fill vacancies on the Chariho Regional School Committee by the town councils in Charlestown and Hopkinton apparently have occurred over the years. According to the papers filed by respondent Johnson, "Hopkinton filled vacancies in 2020 and 2021, while Charlestown filled a vacancy in 2002" in compliance with Section 10(1)(c) of the Chariho Act.

**The Richmond Town Charter**

Richmond adopted its Home Rule Charter in 2008 and included Article 2, § 5(B), entitled "Vacancy in elective office." This subsection provides that in the event of a vacancy on the town council or the school committee,

> "the Town Council shall appoint the unelected candidate who received the greatest number of votes for that office in the most recent general or special election. If that person is unavailable, the Town Council shall appoint in sequence the unelected candidates who received the next greatest number of votes." Richmond Town Charter, Art. 2, § 5(B).

The town council has no discretion in making this appointment and must name an individual who was not elected by the voters, nor the town council. Clearly, this provision cannot be reconciled with the Chariho Act, such that no further

- 30 -

discussion is warranted. In my opinion, although this provision applies to a town council vacancy and would apply should the town terminate its membership in the regional school district and revert to local education, this provision does not trump the Chariho Act.

The law with respect to the General Assembly's plenary authority over education is quite clear: "[N]o *provision* affecting education contained within a home rule charter, so called, can effectively regulate the conduct of school committees as agents of the state unless *expressly validated* by an act of the general assembly" because sole responsibility for education is "expressly and affirmatively reserve[d] to the legislature" in the state constitution. *Royal v. Barry*, 91 R.I. 24, 30, 160 A.2d 572, 575 (1960) (emphasis added); *see also Coventry School Committee v. Richtarik*, 122 R.I. 707, 713, 411 A.2d 912, 915 (1980).

Because Article 2, § 5(b) of the Richmond Town Charter directly, and irreconcilably conflicts with a special act of the General Assembly concerning the election of school committee members, our jurisprudence has been clear and unequivocal: The charter provision must be explicitly validated by the General Assembly to be operative. *See Royal*, 91 R.I. at 30, 160 A.2d at 575. That is, the specific charter section must be expressly validated and textually apparent. A generalized, catch-all provision by the General Assembly does not carry the day in this constitutional realm, in my opinion, and there is no law to the contrary. This

general validation language appears in several charter ratification acts and has never qualified as an express validation of conflicting law.

This is not the first occasion in which this Court has been called upon to decide whether a provision in a municipal charter takes precedence over a matter within the exclusive constitutional province of the General Assembly, or a state law of general application. "Notwithstanding the right of towns and cities to regulate local matters, we have held previously, that '[w]hen local laws conflict with general laws of statewide application, the former must defer to the latter.'" *Town of Johnston v. Santilli*, 892 A.2d 123, 128-29 (R.I. 2006) (quoting *Local No. 799, International Association of Firefighters AFL-CIO v. Napolitano*, 516 A.2d 1347, 1349 (R.I. 1986)).

The long-recognized exception to this rule, however, arises "when the conflicting charter provision has been legislatively ratified" by the General Assembly. *Santilli*, 892 A.2d at 129. "In such instances, we view the conflicting charter provision as 'a special act [that] takes precedence over any inconsistent provisions of the general laws.'" *Id.* (quoting *Napolitano*, 516 A.2d at 1349). In the case at bar, the majority's conclusion that a specific provision of the Richmond Town Charter has been expressly ratified by P.L. 2009, ch. 12, the charter ratification special act, is incorrect, in my opinion, because the Richmond Town Charter does not contain any provision in which the voters referred to the Chariho Act and

certainly there is nothing, anywhere, that would suggest to me that the General Assembly even referenced the Chariho Act in general, or Section 10, in particular. The Charter is silent and the ratification statute was equally silent.

My conclusion that the Richmond Town Charter does not comply with the mandate of express ratification arises from our well-established jurisprudence over the last seventy years. As has long been the case, "the Legislature continues to exclusively occupy the fields of education, elections, and taxation, thereby precluding any municipality's foray into these areas, absent specific legislative approval." *Amico's Incorporated v. Mattos*, 789 A.2d 899, 903 (R.I. 2002). Our analysis has never wavered. The requirement that in order to trump the statute, the charter *provision* must be expressly ratified by the General Assembly was born shortly after the Home Rule Amendment was approved by the voters after the 1951 constitutional convention. *See Opinion to the House of Representatives*, 80 R.I. 288, 297, 96 A.2d 627, 631 (1953). The General Assembly "may[,] by appropriate legislation validate any *provision* in a home rule charter which is inconsistent" with the General Assembly's constitutional authority. *Id.* at 296, 96 A.2d at 631 (emphasis added). Express ratification of a conflicting charter provision is not accomplished by implication; the specific section of the charter must be "ratified by an *explicit legislative act*." *Foster Glocester Regional School Building Committee v. Sette*, 996 A.2d 1120, 1125 (R.I. 2010) (emphasis added). The term "explicit" is

defined as: "Fully and clearly expressed; leaving nothing implied." The American Heritage Dictionary of the English Language 625 (5th ed. 2011). The term "express" means:

> "Clearly and unmistakably communicated; stated with directness and clarity." Black's Law Dictionary 726 (11th ed. 2019).

While employed interchangeably at times, these terms are not identical.

> "Usage: *Explicit* and *express* both apply to something that is clearly stated rather than implied. *Explicit* applies more particularly to that which is carefully spelled out: *explicit instructions*. *Express* applies particularly to a clear expression of intention or will: *an express promise* or *an express prohibition*." The American Heritage Dictionary of the English Language 478 (2d College ed. 1982).

Because we are faced with a special act of the General Assembly, the Chariho Act, that falls within the General Assembly's exclusive constitutional authority over education and, additionally, concerns a charter provision concerning the filling of an elective office, our law is clear: to supersede the Chariho Act, § 10 must be expressly validated and ratified, that is, in my opinion, set forth in words. I disagree with the majority's conclusion that the provision was expressly ratified.

## Express Ratification and Validation

In *Opinion to the House of Representatives*, 80 R.I. 288, 96 A.2d 627 (1953), this Court was confronted with fifteen questions propounded by the House of

Representatives concerning the validity of certain provisions that allowed for nonpartisan nominations and that fixed the time for a municipal election that were contrary to state law, as set forth in a recently adopted charter in an unnamed community. *Id.* at 289-93, 96 A.2d at 627-29. This Court concluded that the charter provisions intruded upon the General Assembly's exclusive authority over elections and were not valid. *Id.* at 294, 96 A.2d at 630. Notably, we issued our advisory opinion on April 23, 1953; *after* a municipal election had been held, two weeks earlier, on April 7, 1953, in the city of Woonsocket.[6]

After careful review of the issues raised in the request for an advisory opinion, the justices succinctly answered each of the first thirteen questions[7] "by saying that *all matters* pertaining to the conduct of municipal general elections referred to in such questions are exclusively within the province of the general assembly and are subject to existing general laws." *Opinion to the House of Representatives*, 80 R.I. at 296, 96 A.2d at 631 (emphasis added). The justices hastened to advise the Legislature how it could remedy this situation. *Id.* at 296-97, 96 A.2d at 631. The

---

[6] In answering the request for an advisory opinion, (after the election had been held), the justices declared that they had "given these questions long and serious study, even to the extent of taking time from the consideration of a lengthy list of litigated cases which have been heard and are awaiting our determination." *Opinion to the House of Representatives*, 80 R.I. 288, 293, 96 A.2d 627, 629-30 (1953).

[7] Because we concluded that questions fourteen and fifteen related to the rights of individuals with little bearing on the provisions of a charter, we declined to address them. *Opinion to the House of Representatives*, 80 R.I. at 297, 96 A.2d at 631.

justices declared that provisions in a home rule charter that intrude upon the authority of the General Assembly, or otherwise conflict with the general laws could be reconciled. *Id.* We advised as follows:

> "Of course if it chooses to do so [the General Assembly] may by appropriate legislation validate any provision in a home rule charter which is inconsistent with this opinion. Such an act would be an exercise of the general assembly's plenary power over the conduct of elections as it was reaffirmed by section 7 of article XXIX of amendments." *Id.* at 296-97, 96 A.2d at 631.

Two months later, on the heels of *Opinion to the House of Representatives*, the General Assembly, on June 17, 1953, enacted P.L. 1953, ch. 3235, "An Act Pertaining to Municipal Primaries and Elections in the City of Woonsocket State of Rhode Island, and Also Validating *Certain Provisions* in City of Woonsocket Rhode Island Home Rule Charter." (Emphasis added.) It did so with explicit language that textually manifested the General Assembly's express intentions:

> "[I]t is the express intention of the general assembly of the state of Rhode Island by the passage of this act to give effect to all of the provisions of the city of Woonsocket Rhode Island home rule charter, said charter having been duly adopted by the qualified electors of said city in a general election held on November 4, 1952, in accordance with the provisions of article XXVIII of the amendments to the constitution of the state of Rhode Island and whereas, *it is the express intention of the general assembly by the passage of this act to give effect, more especially, to those certain provisions in said home rule charter pertaining to municipal primaries and elections in said*

- 36 -

*city*; now, therefore, in the conduct of city primaries and city elections in said city of Woonsocket for the purpose of nominating and electing city officers under said home rule charter[.]" Public Laws 1953, ch. 3235 (emphasis added).

Additionally, as suggested by the justices in the advisory opinion, "to avoid the possibility of a contest over the legality of a municipal general election"—that had already taken place—the General Assembly was advised by the justices to "also provide in the act for the conduct of such election consistently with existing law; or else it should *expressly provide by special act* for all necessary [election] procedures to be followed in the * * * holding of a municipal general election in a particular city or town." *Opinion to the House of Representatives*, 80 R.I. at 297, 96 A.2d at 631 (emphasis added). The enabling act set forth a series of election laws that applied solely to the City of Woonsocket and specifically declared,

> "[I]t is the express intention of the general assembly by the passage of this act to give effect, more especially, to those certain provisions in said home rule charter pertaining to municipal primaries and elections in said city; now, therefore, in the conduct of city primaries and city elections in said city for the purpose of nominating and electing city officers under said home rule charter[.]" Public Laws 1953, ch. 3235.

Furthermore, in a separate provision, the 1953 Act went on to specifically ratify and validate the election that previously was held in Woonsocket on April 7, 1953, in accordance with the newly enacted city charter, "as if this act had been

enacted prior to the date of the holding of said election, and all persons elected in said election shall be deemed to have been lawfully elected." Public Laws 1953, ch. 3235, § 31.

Thus, this Court's jurisprudence concerning the constitutional authority of the Legislature to enact laws in areas that are constitutionally committed to the General Assembly in harmony with the Home Rule Amendment and the prerogatives of the cities and towns to self-govern came to be and is well established. Our subsequent caselaw has been consistent and exact.

This Court's opinion in *Royal* is instructive. *Royal* presented an actual case or controversy concerning § 4-1806 of the Pawtucket City Charter that mandated that all meetings of the school committee shall be in open session that conflicted with a state statute concerning the General Assembly's plenary authority over education. *Royal*, 91 R.I. at 30, 160 A.2d at 575. We rejected the contention that a special act of the General Assembly, issued in accordance with this Court's opinion in *Opinion to the House of Representatives*, which validated charter provisions concerning elections, also served to validate other provisions of the charter because there was no provision that expressly validated the provisions of the charter relied upon by the petitioner. *Id*. at 30-31, 160 A.2d at 575-76. Because there was nothing in the validating legislation for the Pawtucket Home Rule Charter that either expressly or impliedly ratified the charter requirement for open-meetings, the

provision was invalid. *Id.* In contrast, in *Coventry School Committee*, 122 R.I. 707, 411 A.2d 912, an action seeking declaratory and injunctive relief concerning the authority of the Coventry School Committee to retain counsel separate from the solicitor's office, the parties conceded that the Coventry town charter had been expressly validated by the General Assembly in all respects; this Court examined the charter as a whole. *Id.* at 709, 713-14, 411 A.2d at 912-13, 915. Notably, in deciding this case the Court was not confronted with two conflicting statutory provisions. *Id*.

Turning to the City of Providence, in 1980, the citizens of Providence enacted a home rule charter and our caselaw concerning charter ratification was further refined. One case of note arose in 1986, that challenged the residency requirement for new employees of the City of Providence, after the home rule charter was adopted. *Napolitano*, 516 A.2d at 1347. In *Napolitano*, the union and thirty-one members of the fire department sought to enjoin enforcement of § 1210 of the Providence charter, which mandated that all employees hired after January 3, 1983, reside within the city. *Id*. The plaintiffs alleged that § 1210 was superseded by several provisions of the general laws, specifically G.L. 1956 § 45-2-15, providing that no city or town may require an individual to reside within the city or town as a condition for appointment in a police or fire department, and G.L. 1956 § 16-12-9 (same as applied to school teachers). *Id*. at 1348.

This Court affirmed the trial justice's conclusion that because § 1210 was expressly validated by P.L. 1981, ch. 37, "[t]he clear and unambiguous language of this enactment indicates that the Legislature intended to validate § 1210 of the home rule charter." *Napolitano*, 516 A.2d at 1349. The General Assembly's declared intent to unambiguously validate § 1210 (and several other provisions) of the Providence Home Rule Charter, satisfied this Court that § 1210 superseded state law. *Id*.

Conclusively, in my opinion, § 1210 was textually referenced by the General Assembly in the ratification statute, and its absence with respect to the Richmond Town Charter is fatal to the petition before the Court. In ratifying the Providence Home Rule Charter, the General Assembly provided in P.L. 1981, ch. 37, in relevant part:

> "Section 1. In all respects in which the home rule charter of the city of Providence, approved on November 4, 1980, may require ratification, confirmation, validation or enactment by the general assembly, but in no other respects, the provisions of the home rule charter *including, but not limited to sections 201, 204, 208, 209, 707, 908, 1210 and 1404* so adopted are hereby ratified, confirmed, validated and enacted." Public Laws 1981, ch. 37 (emphasis added).

Significantly, after setting forth the specific provisions of the Charter it expressly intended to ratify, the General Assembly then included the general charter-ratification language that is almost identical to the provision exclusively

- 40 -

relied upon by the majority in its conclusion that the vacancy filling provision of the Charter was expressly ratified.

Notably, in *Napolitano*, we were confronted with a charter provision that was in conflict with a state law of general application. *Napolitano*, 516 A.2d at 1348. The decision rested on our conclusion that because § 1210 of the home rule charter, the residency requirement, was expressly validated by P.L. 1981, ch. 37, § 1210, it "supersedes §§ 45-2-15 and 16-12-9 to the extent that it conflicts with these provisions."[8] *Id*. In deciding *Napolitano*, we again looked to *Opinion to the House of Representatives*, and echoed our long-standing holding that the General Assembly may "grant permission to a municipality to legislate in areas already regulated by the general laws" if it does so in conformity with that holding. *Id*. at 1349. We declared that the General Assembly "may by appropriate legislation validate any *provision* in a home rule charter * * *." *Id*. (emphasis added) (quoting *Opinion to the House of Representatives*, 80 R.I. at 296, 96 A.2d at 631). Importantly, we declared that P.L. 1981, ch. 37 "specifically provides that § 1210 of the home rule charter is 'hereby ratified, confirmed, validated and enacted.'" *Id*. The "clear and

---

[8] We also noted that just prior to the time the trial justice issued his decision, on June 7, 1985, the General Assembly amended G.L. 1956 § 45-2-15 to specifically exclude the city of Providence from its application. *Local No. 799, International Association of Firefighters AFL-CIO v. Napolitano*, 516 A.2d 1347, 1348 (R.I. 1986). We deemed that amendment to be irrelevant to our decision, which rendered it meaningless in light of our unequivocal holding. *Id*. at 1348-49.

unambiguous language of this enactment indicates that the Legislature intended to validate § 1210 of the home rule charter." *Id.* This was not the case in Richmond.

The General Assembly ratified the Richmond Town Charter in 2009. That act, P.L. 2009, ch. 12, does not refer to Article 2, § 5(B), the vacancy-filling provision, nor does the act refer to the school committee in general or the Chariho Regional School Committee in particular. In my opinion, Purcell's petition must be denied because there is no express and unambiguous validation of Article 2, § 5(B) (vacancy filling provision) of the Charter and it therefore cannot take precedence over the Chariho Act.

Additional cases concerning the City of Providence and its Home Rule Charter are also of note. There were eight separate provisions in the Providence Home Rule Charter that were explicitly ratified by the General Assembly in section 1 of P.L. 1981, ch. 37. This Court has had occasion to address several of them. Our opinion in *Retirement Board of Employees' Retirement System of City of Providence v. City Council of City of Providence* (*Retirement Board*), 660 A.2d 721 (R.I. 1995), is most instructive. That case concerned two provisions of the Providence Home Rule Charter that were textually and explicitly ratified by the General Assembly in P.L. 1981, ch. 37. *Retirement Board*, 660 A.2d at 725. The Providence City Council enacted an ordinance that transferred the authority to invest pension funds to the Board of Investment Commissioners, that was created by ordinance. *Id.* The

plaintiff, the Providence Retirement Board, took exception to the diminution of its authority and brought suit, claiming that "the [ordinance] was in reality an attempt to amend the city's Home Rule Charter and thus required a citywide referendum." *Id.* at 723.[9] This Court reversed the judgment of the Superior Court and declared that under the 1980 Home Rule Charter, "the retirement board was designated a board of the city in § 908 of the charter" and, further, that § 908 was "ratified, confirmed, validated and enacted" by the General Assembly in P.L. 1981, ch. 37, § 1. *Id*. at 725, 729. Section 908 was among the eight charter provisions expressly ratified by the General Assembly. *See* P.L. 1981, ch. 37, § 1.

Turning to the authority of the city council to direct who can invest the city's pension funds, we looked to charter provision § 1404, entitled "Inconsistent acts and ordinances" which provides:

> "Upon the taking of effect of this Charter and the validation of *this section* by the General Assembly, this Charter shall be deemed to have superseded Chapter 832 of the Public Laws of 1940 and all acts in amendment thereto which are inconsistent with this Charter and shall be deemed to have superseded all other acts and parts of acts applicable to the City of Providence which are inconsistent with this Charter. Upon the taking of effect of this Charter, all ordinances and resolutions inconsistent

---

[9] A companion case by seven members of the Employees' Retirement System, alleging individual harm was consolidated by order of the Superior Court. *Retirement Board of Employees' Retirement System of City of Providence v. City Council of City of Providence* (*Retirement Board*), 660 A.2d 721, 723-24 (R.I. 1995).

therewith shall be deemed to have been repealed, and all ordinances and resolutions which are consistent therewith shall remain in effect until amended or repealed by the city council in conformity with the terms of this Charter." *Retirement Board*, 660 A.2d at 727 (emphasis added).

Based on § 1404, which was adopted by the voters and textually validated by the Legislature and § 908, which was also expressly validated by the General Assembly, this Court concluded that the retirement board became a city board and its "status as an independent corporate entity did not survive its incorporation into the charter." *Id*. at 728. In so doing, we again referenced and highlighted the General Assembly's express ratification of the charter in P.L. 1981, ch. 37, § 1 "which specifically ratified the section establishing the retirement board: '[T]he provisions of the home rule charter including, but not limited to sections 201, 204, 208, 209, 707, *908*, 1210 and 1404 so adopted are hereby ratified, confirmed, validated and enacted.'" *Id*. This analysis was focused on the specific provision of the Providence Home Rule Charter set forth in the ratification statute and not the general ratification language. *Id.*

Of particular note, in my opinion, is *Retirement Board of the Employees' Retirement System of the City of Providence*, which concerned a special act of the General Assembly, the Retirement Board Act, that created the Retirement Board, and was inconsistent with a provision in the Providence Home Rule Charter. *Retirement Board*, 660 A.2d at 725-26. We concluded that the charter superseded

the special act by § 908 of the charter. *Id*. at 728.[10] Because the charter provision trumped the special act, we did not engage in statutory construction.

Our decision in *Bruckshaw v. Paolino*, 557 A.2d 1221 (R.I. 1989), also concerns a special act, but in a different context. Public Laws 1985, ch. 468, was enacted by the General Assembly after home rule and was in conflict with § 908, which had been expressly ratified by the General Assembly. *Bruckshaw*, 557 A.2d at 1222-23. The General Assembly was found to have intruded upon the home rule prerogatives of the City of Providence when it enacted the special act concerning the purchase of retirement benefits for certain employees of the Providence retirement system. *Id*. at 1222. After the Retirement Board refused to comply with the special act, the plaintiff sought a declaratory judgment seeking a judicial determination of its validity. *Id*. This Court affirmed the trial justice's holding that the charter provision prevailed over the special act because, *inter alia*, the authority to regulate city employee pensions was vested in the city by the charter that was ratified by the General Assembly; the regulation of pensions was a matter of local concern and, because the special act did not apply to the state as a whole, nor was it submitted to the voters of Providence, it was invalid and unenforceable. *Id.* at 1224.

---

[10] This Court also rejected the Retirement Board's argument that the source of its authority to continue to invest retirement funds derived from § 908 of the charter. *Retirement Board*, 660 A.2d at 728.

Furthermore, the second part of the ratification statute, P.L. 1981, ch. 37, § 1, which is the general catch-all ratification provision that is found in various special acts that ratify home rule charters, is almost the identical language upon which the majority relies in the instant case:

> "It is the express intention of the general assembly by the passage of this act, to give effect to, ratify, confirm, validate and enact those certain provisions of the home rule charter of the city of Providence approved on November 4, 1980, which require ratification, confirmation, validation or enactment, but nothing in this act shall be construed to abrogate or impair the powers now or hereafter granted to towns and cities by Article XXVIII of the amendments to the constitution and other applicable laws of the state of Rhode Island or those rights retained by said city in said charter."

I am hard-pressed to view this general ratification as qualifying as an explicit validation of a specific provision of a home rule charter that satisfies the constitutional requirements of express validation. Public Laws 2009, ch. 12 provides:

> "SECTION 1. In all respects in which the Home Rule Charter adopted by the electors of the Town of Richmond on November 4, 2008 may require ratification, confirmation, validation or enactment by the General Assembly, but in no other respects, the provisions of the Home Rule charter of the Town of Richmond are hereby ratified, confirmed, validated and enacted. It is the express intent of the General Assembly by the passage of this Act to give effect and to ratify, confirm, validate and enact those provisions of the said Home Rule Charter of the Town of Richmond that require ratification, confirmation, validation or enactment, and by the passage

- 46 -

of this Act, the General Assembly does hereby ratify, confirm, validate and enact said Home Rule Charter, but nothing in this Act shall be construed to abrogate or impair the powers now or hereafter granted to the towns by Article XIII of the Constitution of the State of Rhode Island or those rights retained by said Town of Richmond."

In my opinion, this general ratification simply cannot qualify as an express ratification and validation of Article 2, § 5(B) of the Richmond Town Charter as required by the Constitution. Article 2, § 5(B) concerns a matter over which the General Assembly has exclusive constitutional authority and any delegation thereof must be explicitly set forth, as in every case that has come before us.

I also note that when it ratified the Richmond Town Charter, the General Assembly referenced a multitude of special acts "enacted solely for the benefit of the Town of Richmond that are inconsistent with the provisions of the Home Rule Charter * * *." *See* P.L. 2009, ch. 12, § 2. Section 2 of P.L. 2009, ch. 12 provides:

"SECTION 2. All special acts or portions of special acts of the General Assembly enacted solely for the benefit of the Town of Richmond that are inconsistent with the provisions of the Home Rule Charter adopted by the electors of the Town of Richmond on November 4, 2008 are hereby repealed, including but not limited to Chapter 1674 of the Public Laws of 1930 (election of town officers), Chapter 3705 of the Public Laws of 1956 (election of town officers), Chapter 264 of the Public Laws of 1968 (tax assessor and board of review), Chapter 106 of the Public Laws of 1969 (tax assessor and board of review), Chapter 362 of the Public Laws of 1978 (fees collected by public officials), Chapter 35 of the Public Laws of 1988 (tax bills), Chapter 79 of the Public Laws of

> 2002 (Planning Board alternates), Chapter 124 of the Public Laws of 1986 (street acceptance), Chapter 39 of the Public Laws of 1967 (budget committee), Chapter 17 of the Public Laws of 1990 (budget committee), Chapter 52 of the Public Laws of 1990 (financial town meeting), Chapter 17 of the Public Laws of 1993 (financial town meeting); and Chapter 51 of the Public Laws of 1990 (board of finance)."

This convinces me that the General Assembly was well aware of its prior enactments that solely affected the Town of Richmond before home rule and was certainly aware of the Chariho Act and its numerous amendments, which not only concerned education, but also encompassed two other communities. One could conclude that the omission of any reference to the Chariho Act was deliberate.

Lastly, there are two opinions cited by the parties that are of little relevance to the case at bar, in my opinion, because neither case deals with charter ratification: *Santilli*, 892 A.2d 123, and *Sette*, 996 A.2d 1120. In *Santilli*, this Court was confronted with competing arguments concerning whether, under the provisions of the Johnston Town Charter, the Johnston School Committee could engage "the services of attorneys not affiliated with the town solicitor's office[,]" despite the charter's "clear language" that the town solicitor "is to 'be the attorney for the town and legal advisor to the Mayor, town council, and *all other departments, offices and agencies of the town government*.'" *Santilli*, 892 A.2d at 125 (emphasis added). However, in 1998, the town council enacted Ordinance 1029, which authorized the school committee to hire its own lawyer. *Id*. at 126. This harmony was short-lived

in Johnston and, in July 2002, the Johnston Town Solicitor informed the school committee that, in accordance with the charter, his office would provide legal services to the school committee. *Id.* Because the school committee continued to employ outside legal counsel, Ordinance 1029 was repealed and the town filed a complaint for declaratory relief. *Id.* The school committee counterclaimed and sought declaratory and injunctive relief to retain legal counsel, independent from the town council. *Id.*

Although this Court began by recognizing the constitutional implications concerning the General Assembly's "responsibility to 'promote public schools * * * and to adopt all means which it may deem necessary to secure to the people the advantages and opportunities of education,'" *Santilli*, 892 A.2d at 128 (quoting R.I. Const., art. 12, § 1, that is juxtaposed with article 13, the Home Rule Amendment), we decided this case on the basis of the duties of the town solicitor as legal representative for all town departments, *id.* at 131. We began by addressing the "interplay between the Legislature and town governments in regulating public education," and we looked to the seminal holding in *Royal* that "no provision affecting education contained within a home rule charter, so called, can effectively regulate the conduct of school committees as agents of the state unless expressly validated by an act of the general assembly." *Id.* at 128 (quoting *Royal*, 91 R.I. at 30, 160 A.2d at 575). We further elucidated that when the conflicting charter provision

has been legislatively ratified, the conflicting charter provision is viewed as "a special act [that] takes precedence over any inconsistent provisions of the general laws." *Id*. at 129 (quoting *Napolitano*, 516 A.2d at 1349).

In *Santilli*, because only one of the two relevant provisions of the Johnston Town Charter had been ratified by the General Assembly, this Court eliminated the unratified provision from our discussion.[11] *Santilli*, 892 A.2d at 129. We concluded that the school committee could not retain independent legal counsel based on the restrictions found in the language of § 6-4 of the charter, *id*. at 131, which provides in relevant part as follows:

> "Sec. 6-4 Duties.
>
> "The town solicitor shall be the attorney for the town and legal advisor to the mayor, town council, *and all other departments, offices and agencies of the town government* and shall direct the work of the assistant solicitors." *Id*. at 127 (original emphasis omitted; new emphasis added).

Despite our conclusion about the legislative validation and precedence of charter provision § 6-4, the school committee persisted in its argument that the committee was not a "department" of the town. *Santilli*, 829 A.2d at 129. We looked to *Cummings v. Godin*, 119 R.I. 325, 377 A.2d 1071 (1977), in which we held that "school committees, although exercising a portion of the state's power

---

[11] The Johnston Town Charter was ratified in May 1963 in P.L. 1963, ch. 187. Notably, the charter's election procedures were explicitly ratified. *See* P.L. 1963, ch. 187, § 1.

over education, are, nonetheless, municipal bodies, and their employees * * * are municipal employees." *Id*. (quoting *Cummings*, 119 R.I. at 330, 377 A.2d at 1073). Our decision in *Coventry School Committee* was also of note because in that case, this Court concluded that the Coventry School Committee lacked the authority to retain its own counsel based on a town charter provision that the parties stipulated had been legislatively ratified. *Id*. at 130. Turning to Johnston's town charter, "we faile[d] to see any meaningful distinction between the charter provision in [*Coventry School Committee*] and the one at issue here[,]" and held that § 6-4 of the Johnston Town Charter provision prevailed. *Id*. at 131.[12] We did not engage in statutory construction.

In *Sette*, 996 A.2d 1120, four members of the Glocester Town Council who voted to remove a member of the Foster Glocester Regional School Building Committee by declaring his seat vacated, appealed from a declaratory judgment in favor of the building committee by a justice of the Superior Court. *Sette*, 996 A.2d at 1122. This Court affirmed the decision of the trial justice that in order for the town council to have removal authority, "there must be explicit legislation to that effect." *Id*. at 1122-23. We decided that there was no state law before us authorizing

---

[12] The Court in *Town of Johnston v. Santilli*, 892 A.2d 123 (R.I. 2006), went on to address those situations in which "the solicitor's ethical and professional obligations" prevents the solicitor from serving as counsel to the school committee, a discussion not relevant to this case. *Santilli*, 892 A.2d at 131.

removal. *Id.* at 1128. Because there were no provisions in the enabling act that created the regional school district, nor any other legislative acts, that granted removal authority to the town council, we concluded that the council lacked the requisite authority to remove the member. *Id*. at 1127-28.

The defendants argued to this Court that the council was vested with removal authority in Article XIV, § C 14-2 of the Glocester Town Charter, which provides that the term of office of members of boards and commissions was concurrent with the term of the town council. *Sette*, 996 A.2d at 1124.[13] We began our analysis as always, by referencing Article 12, § 1 of the state constitution that assigns responsibility to the General Assembly "to promote public schools * * * and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education * * *." *Id.* at 1125 (quoting R.I. Const., art. 12, § 1). We contrasted this provision with article 13 of the constitution, the Home Rule Amendment, that permits a municipality to "adopt charter provisions that affect education, as long as such charter provisions are ratified by an explicit legislative act." *Id*. (citing *Santilli*, 892 A.2d at 128).

Although unnecessary to the ultimate holding in *Sette*, after referring to the long-standing rule of *Royal* that "[n]o provision affecting education contained

---

[13] The defendants also argued alternatively that there was an implied power to remove members of committees it had appointed. *Foster Glocester Regional School Building Committee v. Sette*, 996 A.2d 1120, 1125 (R.I. 2010).

within a home rule charter, so called, can effectively regulate the conduct of school committees as agents of the state unless expressly validated by an act of the general assembly[,]" we declared that the Court would "not assume that the town council possesses the authority to remove a member of a regional school body, such as the [building committee] in the absence of legislation that expressly grants that authority." *Id*. at 1125, 1127. After examining the charter, the Court concluded that "the municipal charter does not authorize the town council to remove members of the [building committee.]" *Id*. at 1127. We looked to the enabling act, P.L. 1958, ch. 109, and likewise concluded that nothing in that act authorized the town council to remove members. *Id*. at 1128 n.5. Thus, in *Sette*, this Court was not confronted with conflicting provisions between a town charter and a special act of the General Assembly. *Id*. at 1128; *see also Marro*, 108 R.I. at 194, 196, 273 A.2d at 661, 662 (in answering the question whether a provision in a home rule charter permitted the city of Cranston to transfer to an employee retirement board the powers and duty over the disability and retirement of police officers that was assigned to the mayor and city council under a prior enabling act of the General Assembly, the Supreme Court declared that police and public safety were matters of state control).

Although *Santilli* and *Sette* are emblematic of the clear and consistent path this Court embarks upon when confronted with municipal charters and state law, neither case concerned the ultimate issue in the case at bar: whether the General

Assembly has expressly ratified a provision of a municipal charter that concerns a matter within its exclusive jurisdiction. Indeed, the charter provision in *Santilli* concerned the duties of the town solicitor, a purely local matter. *See Santilli*, 892 A.2d at 127. Because the case before us presents an issue of constitutional dimension, committed to the judiciary for resolution, I am not in agreement with the majority's conclusions.

## Statutory Construction

As noted herein, it is my opinion that where a charter provision that concerns a matter over which the General Assembly has exclusive authority is found to have been expressly validated, as set forth in our caselaw, we do not engage in statutory construction, the charter provision is given precedence because it serves as a delegation of that authority to the city or town. I therefore disagree with the majority's entry into this realm and respectfully suggest that the majority has deviated from the well-settled and appropriate standards for statutory interpretation.

When undertaking statutory interpretation, this Court is "oblig[ed] to give, if possible, effect to all of the act's provisions, with no sentence, clause, or word construed as unmeaning or surplusage." *In re Rhode Island Commission for Human Rights*, 472 A.2d 1211, 1212 (R.I. 1984). We do not confine our analysis to a single provision or subsection of an act. "Where one provision is part of the overall

statutory scheme, the legislative intent must be gathered from the entire statute and not from an isolated provision." *State v. Caprio*, 477 A.2d 67, 70 (R.I. 1984).

The majority has confined its analysis of Section 10 of the Chariho Act to a single subsection and has, in my opinion, deviated from our statutory interpretation principles. The majority's analysis should begin with the Chariho Act as a whole, and end with Section 10, which is extensive.

As noted herein, in 1986, the General Assembly comprehensively amended the Chariho Act, including the election, tenure, and authority of the body politic, that embraces three communities. Section 10 of P.L. 1986, ch. 286 provides in relevant part as follows:

> "Sec. 10. (1) (a) There shall be a regional school committee for said district consisting of eleven (11) members, each member town shall be represented on the committee in direct proportion to its population as determined by the most recent population census figures. The total population of the district shall then be divided by eleven (11) and the resulting quotients thus obtained shall be used as the basis for determining the proportionate representation of each said member town on said committee, and realizing that the mathematical divisions of said formula will not obtain absolute evenness, fractions of .5 or more shall be construed as 1 point and fractions less than .5 shall be construed as 0. Subject to limitations aforesaid, the members of said committee from each of the member towns to be elected or appointed for terms hereinafter set forth shall be determined as of the time of each bi-annual election and each of the said member towns, based upon the census aforesaid. The first such regional school committee shall be elected in the general election in November, 1988. In the general election 1988

- 55 -

each town electing three (3) members of the school committee shall elect two (2) members to serve a term of four (4) years and one (1) member to serve a term of two (2) years. A town electing more than three (3) representatives shall elect three (3) members for a term of two (2) years and additional members for a term of four (4) years. Thereafter members shall be elected for a term of four (4) years. Until such time as those elected in that election shall be certified and qualified, the existing Chariho Regional High School District Committee shall serve as the Regional School Committee. *In the event of any vacancy by death, resignation or incapacity to serve of any term of any member of said regional school district committee, the town council of the member town in which such vacancy occurs shall fill such vacancy by election by a majority vote of the town council of said town for the unexpired term of the member whose office is thus vacated.*" (Emphasis added.)

This provision convinces me that the General Assembly has expressed its clear intent to legislate exclusively with respect to the Chariho Regional School Committee, statutory construction need go no further.

**Conclusion**

For the reasons set forth in this opinion, I respectfully dissent.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Jessica Marie Purcell v. Clay Johnson et al.<br><br>Clay Johnson, in his capacity as Council Appointee to the Chariho Regional School Committee, et al. v. Chariho Regional School Committee. |
| **Case Number** | No. 2023-26-M.P.<br>No. 2023-28-M.P. |
| **Date Opinion Filed** | July 18, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | N/A |
| **Judicial Officer from Lower Court** | N/A |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Jeffrey L. Levy, Esq. |
| | For Defendant:<br><br>Joseph S. Larisa, Jr., Esq. |